UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
ELIZABETH LANGER a/k/a ELIZABETH
FRANKEL,

                  Plaintiff,       MEMORANDUM & ORDER
                                  15-CV-0668(JS)(GRB)

     -against-

PATRICIA BUERKLE, STEPHEN JOHN, M.D.,
and VINCENT GERACI, M.D.,

                  Defendants.
--------------------------------------X
APPEARANCES
For Plaintiff:       Christopher S. Olson, Esq.
                  434 New York Avenue
                  Huntington, New York 11743

For Defendant:       Arlene S. Zwilling, Esq.
                  Suffolk County Attorney
                  H. Lee Dennison Building-Fifth Floor
                  100 Veterans Memorial Highway
                  P.O. Box 6100
                  Hauppauge, New York 11788-0099

FILED
CLERK

8/8/2019 12:05 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

SEYBERT, District Judge:

     Plaintiff Elizabeth Langer a/k/a Elizabeth Frankel
("Plaintiff") alleges that defendants Patricia Buerkle, Stephen
John, M.D., and Vincent Geraci, M.D., all medical employees at the
Suffolk County Correctional Facility ("SCCF") (collectively,
"Defendants") denied her adequate medical care in violation of 42
U.S.C. § 1983. She also alleges a state law medical malpractice
claim. Presently pending before the Court is Defendants' motion
for summary judgment. (Def. Mot., D.E. 56.) For the following
reasons, Defendants' motion is GRANTED.

I. Factual Background[1]

Plaintiff was incarcerated at SCCF in March 2014, serving a sentence for criminal possession of a controlled substance. On April 9, 2014, she fell and injured her foot. (Def. 56.1 Stmt., D.E. 44, ¶¶ 1-2.) At approximately 6:30 a.m., non-party Margaret Mungo, a registered nurse with the Jail Medical Unit ("JMU"), applied an ice pack and sent Plaintiff to Peconic Bay Medical Center ("Peconic"), a private hospital. (Def. 56.1 Stmt. ¶ 3.) Doctors performed X-rays indicating that she had a severely comminuted fracture[2] of her right calcaneus (heel bone). She was not admitted--Peconic staff wrapped her foot in an Ace bandage, prescribed her pain medication, and gave her crutches. She was released at approximately 10:00 a.m. (Def. 56.1 Stmt. ¶¶ 4-6.)

Plaintiff was given discharge instructions. (Def. 56.1 Stmt. Ex. D, D.E. 44-4 ("Discharge Instructions").) They included three pages of standard forms. Page one defined an "Ace Bandage" and explained how to apply one. Page two advised on walking with crutches. Page three gave general instructions for fractures.

---

[1] Unless noted, all facts are undisputed.

[2] A comminuted fracture occurs when a bone breaks into more than two pieces.

The fourth and final page listed the following "Special Advice for: Elizabeth Frankel":

> Call John Brennan Dr today or the next business day for an appointment to be seen. When you call to make the appointment, tell the secretary that you were referred from this facility. When you go to see the doctor, bring these instructions with you.
>
> YOU HAVE A CALCANEUS FRACTURE COMMINUTED. YOU NEED AN ORTHPEDIC (sic) EVALUATION.
>
> NO DRIVING WITH PERCOCET, IT IS SEDATING.
>
> FOLLOW UP WITH ORTHOPEDICS THIS WEEK.
>
> FOLLOW UP WITH JAIL MEDICAL IN 1 DAY.
>
> RETURN FOR ANY WORSENING, CHANGES OR ANY OTHER CONCERNS.
>
> RETURN FOR PROBLEMS WITH FOLLOW UP.

(Discharge Instructions at ECF p. 5 (capitalization in original).)

That same day, when she returned to the JMU, at approximately 11:00 a.m., she was seen by defendant Patricia Buerkle, a nurse practitioner. Buerkle ordered prescription strength ibuprofen and ice. She noted Peconic's diagnosis and follow-up recommendation on Plaintiff's medical chart. (Def. 56.1 ¶ 8; Def 56.1 Stmt. Ex. E, D.E. 44-5 ("April 9 Chart").) Because Peconic recommended Plaintiff follow up with an orthopedic specialist, she also completed a consultation request for Plaintiff to see an outside orthopedist. There are no orthopedists on staff in the JMU. If necessary, the JMU requests appointments

with outside medical providers, and those outside providers choose the date and time of an inmate's appointment. (Def. 56.1 Stmt. ¶ 9-10.)

Ten days later, on April 19, 2014, defendant Stephen John, M.D. saw Plaintiff in the JMU. Plaintiff was on crutches and stated that she was in pain and the ibuprofen was not working. John changed her pain medication and ordered a sonogram to rule out deep vein thrombosis. He noted in her medical chart that the request for an orthopedic consultation was still pending. (Def. 56.1 Stmt. ¶ 10;[3] Def. 56.1 Stmt. Ex. H, April 19 Progress Note, D.E. 44-8.) A sonogram performed one day later showed no deep vein thrombosis. John did not see Plaintiff again. (Def. 56.1 Stmt. ¶¶ 11-12.)

On April 30, Buerkle saw Plaintiff again. She noted on the chart that Plaintiff was upset she had not been seen by an orthopedist and that she told Plaintiff to sign a release so her chart could be forwarded to a consulting orthopedist. She also discussed the case with non-party Dr. Crowley, a JMU employee. They sent Plaintiff back to the Emergency Room at Peconic because she had not yet seen an outside orthopedist. (Def. 56.1 Stmt. ¶¶ 13-14.) Peconic personnel performed a CT scan, which still indicated the fracture. In her discharge instructions, she was

_____

[3] There are 2 number 10 paragraphs. This cite is the second paragraph 10.

4

again referred to Dr. John Brennan and told to call him that day or the next for an appointment. (Def. 56.1 Stmt. ¶ 15.)

When Plaintiff returned to the JMU, non-party Dr. Dennis Russo noted her second emergency room visit in her chart. He further noted Plaintiff's statement that since she was scheduled to be released from jail in two days, following up was a "moot point" and that she was "OK with continuing her present meds and setting up a follow up in community after release." (Def. 56.1 Stmt. ¶ 16.)

The next day, May 1, 2014--before her release--Plaintiff had her outside consultation with Brennan. He noted there had been a "delay in follow up." He examined her and "reviewed the case with Dr. Gamez who [felt] that she may be a candidate for surgical intervention. [He] referred her to [Dr. Gamez] for consultation." (Def. 56.1 Stmt. ¶ 17; Def. 56.1 Stmt. Ex. O, Brennan Notes, D.E. 44-15.)

On May 2, 2014, Plaintiff was released from SCCF. She did not see Brennan or Gamez again. (Def. 56.1 Stmt. ¶¶ 18-19.) Approximately two weeks after leaving SCCF, she saw Dr. Edward Kormylo. He noted that she required open reduction and internal fixation. He further noted that she was "contemplating surgical management" but that he would "likely need to hold [off] on surgery until further consolidation of fracture." (Def. 56.1 Stmt. ¶ 21; Def. 56.1 Stmt. Ex. Q, Kormylo Notes, D.E. 44-17.) He ultimately

performed surgery on Plaintiff's foot on June 2, 2014.  When she was discharged from the hospital, she had no infection.  However, Kormylo had documented in his surgical report that she had not followed preoperative instructions to stop smoking; that she understood continuing intravenous drug use could lead to infection; and that she was aware that failure to comply with his instructions could lead to loss of a limb.  (Def. 56.1 Stmt. ¶ 22; Def. 56.1 Stmt. Ex. R, Surgical Report, D.E. 44-18.)  Plaintiff developed an infection after the initial surgery which required multiple follow-up procedures with Kormylo.  (Def. 56.1 Stmt. ¶ 24; Pl. 56.1 Stmt., D.E. 44-22, ¶ 6.)

When deposed, Kormylo testified that Defendants' actions failed to satisfy "the standard of care for humanity."  (Pl. 56.1 Stmt. ¶¶ 8-9; Pl. 56.1 Stmt. Ex. 9, Kormylo Dep., 59:11-24.) Defendants' orthopedic expert, Dr. David Weissberg, testified that the "typical treatment protocol" for a heel fracture is, assuming the patient is healthy and the skin is in good condition, to "perform [an] open reduction and internal fixation" "approximately two weeks" after injury.  (Pl. 56.1 Stmt. Ex. 5, Weissberg Dep., 13:14-14:4.)  He also noted that "[i]n general, calcaneal fractures are not treated immediately [because] there is a very high complication rate in terms of infection . . . if you operate on a fracture such as this . . . too quickly . . . ."  (Weissberg Dep. 13:6-11.)

Plaintiff alleges that she "sustain[ed] severe and serious personal injuries" and "under[went] eight surgeries due to complications as a result of the delay in treatment and infections." (Am. Compl., D.E. 48, ¶¶ 6, 20.) She argues that Defendants' "failure to provide the required care . . . constituted deliberate indifference to [her] serious medical needs . . . and a departure from good and accepted medical standards . . . ." (Am. Compl. ¶ 19.) Plaintiff does not allege any current existing injury related to these events.

## II. Procedural History

Plaintiff initially filed a Complaint on February 10, 2015. (Compl., D.E. 1.) She filed an Amended Complaint on April 12, 2016 (Am. Compl., D.E. 22) and then, at the direction of this Court, a complete version of the Amended Complaint on April 27, 2019 (Am. Compl., D.E. 48.) Defendants filed their motion for summary judgment on September 20, 2018 and Plaintiff filed her opposition on October 22, 2018 (Pl. Opp., D.E. 57). Defendants replied on November 2, 2018. (Def. Reply, D.E. 58.)

## DISCUSSION

## I. Legal Standard

### A. Summary Judgment

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986). In determining whether an award of summary judgment is appropriate, the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted). Conclusory allegations or denials will not defeat summary judgment. Id. However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

B.  Deliberate Indifference to Medical Needs

As Plaintiff was a prisoner in custody[4] at the relevant time here,

> [t]o defeat summary judgment, [she is] obliged to adduce evidence that defendants were deliberately indifferent to a serious medical need.  This standard consists of both objective and subjective components. Objectively, the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists. Subjectively, the charged official must act with a sufficiently culpable state of mind, i.e., something more than mere negligence and akin to criminal recklessness.

Simpson v. Oakes, 640 F. App'x 86, 87–88 (2d Cir. 2016) (internal quotation marks and citations omitted).

As to the objective prong, "[i]f the prisoner is receiving on-going treatment and the [alleged] offending conduct is an unreasonable _delay_ or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or

---

[4] Though Plaintiff makes claims under the Eighth and Fourteenth Amendments, as a prisoner in custody, her claims are analyzed under the Eighth Amendment only.  Compare Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) ("The Eighth Amendment . . . applies to prison officials when they provide medical care to inmates") with Valdiviezo v. Boyer, 752 F. App'x 29, 32 (2d Cir. 2018) ("The district court erroneously analyzed [the plaintiff's] deliberate indifference to medical needs claims under the Eighth Amendment. [The plaintiff's] claims should be analyzed under the Fourteenth Amendment because he was a pretrial detainee at the time of alleged incidents.").

interruption in treatment rather than the prisoner's underlying medical condition alone." Villafane v. Sposato, No. 16-CV-3674, 2017 WL 4179855, at *19 (E.D.N.Y. Aug. 22, 2017) (quoting Salahuddin v. Goord, 467 F. 3d 263, 280 (2d Cir. 2006)) (emphasis added), R&R adopted, 2017 WL 4157220 (E.D.N.Y. Sept. 15, 2017); cf. Salahuddin, 467 F. 3d at 280 ("if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious") (emphasis added). "In general, where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." Villafane, 2017 WL 4179855 at *20 (internal quotation marks and citations omitted).

"Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-degenerating condition for three days; or delayed major surgery for over two years." Demata v. N.Y. State Corr. Dep't of Health Servs., 198 F.3d 233, at *2 (2d Cir. 1999) (internal quotation marks and citations omitted) (collecting cases). An inmate's belief that

"something more should have been done to treat his [or her] injuries is not a sufficient basis for a deliberate indifference claim." Id.

"The subjective component of deliberate indifference requires a plaintiff to establish that a defendant 'kn[e]w of and disregard[ed] an excessive risk to [his] health or safety.'" Pizarro v. Gomprecht, No. 10-CV-4803, 2013 WL 990998, at *11 (E.D.N.Y. Feb. 13, 2013), R&R adopted, 2013 WL 990997 (quoting Chance v. Armstrong, 143 F. 3d 698, 702 (2d Cir. 1998)) (further citations omitted) (alterations in original). "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." Smith v. Carpenter, 316 F. 3d 178, 184 (2d Cir. 2003). "A showing of medical malpractice is . . . insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003) (internal quotation marks and citation omitted).

"Where a dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, [courts] will not second guess the doctor." Pizarro, 2013 WL 990998 at *13. "[M]ere

differences of opinion between the prisoner and the defendants concerning the proper course of treatment" do not rise to a constitutional violation. <u>Demata</u>, 198 F. 3d at *2.

## II. Defendants' Actions

### A. Nurse Practitioner Buerkle

Because Defendants are sued in their individual capacities,[5] their liability is premised on a showing that they personlly acted with deliberate indifference. See <u>Hernandez</u>, 341 F. 3d at 144. On the day Plaintiff was injured, when she returned from Peconic, Buerkle examined her, iced her heel, and prescribed pain medication. She was aware of Peconic's recommendation that Plaintiff follow up with a specialist, and immediately completed a consultation request. Approximately three weeks later, Buerkle saw Plaintiff again. She noted Plaintiff's complaints about not having yet seen a specialist and had her sign a release so her chart could be forwarded to a specialist. She discussed Plaintiff's case with another doctor on staff, Crowley, and they decided to send Plaintiff back to Peconic because she had not yet seen a specialist.

Buerkle did not show deliberate indifference to Plaintiff's medical needs. To the contrary, she appears to have

---

[5] Plaintiff originally named the County of Suffolk as a defendant. By stipulation, all claims against the County were discontinued with prejudice. (Order Dismissing Parties, D.E. 55.)

taken the steps within her power to address Plaintiff's issues. The JMU did not have an orthopedic specialist on site. Buerkle thus facilitated Plaintiff's consultation by completing a request form, completing a release form, and discussing the case with Dr. Crowley. Buerkle followed established protocol. See Hernandez, 341 F. 3d at 148 (nurse who repeatedly attempted to schedule physical therapy for inmate and received rejections from outside institutions was not deliberately indifferent, and not personally responsible for what "may be an unfortunate institutional failure"). Buerkle also provided care with the ice and pain medication.

As to the objective prong, at most, Plaintiff has demonstrated that she received an orthopedic consultation not within one week, as recommended, but within three weeks--a two-week delay. Further, once she saw the specialist Brennan three weeks after her injury, he only opined that "she may be a candidate for surgical intervention." (See Brennan Notes.) Plaintiff's expert testified that if her injury had been treated earlier, it potentially could have been addressed with a less invasive procedure, and that he "believe[d]" it would have "significantly reduced the likelihood of the development of the infections that [Plaintiff] developed." (Kormylo Dep. 58:15-59:2.) Defendants' expert testified similarly and noted that the "optimal" time to treat Plaintiff's fracture would have been at "approximately two

weeks." (Weissberg Dep. 13:3-7; 13:23-14:4.) He explained that the less invasive procedure had a "decreased" risk of infection. (Weissberg Dep. 24:24-25:7.) He only stated that based upon his review of her medical records, Plaintiff could "possibly" have been a candidate for the less invasive procedure. (Weissberg Dep. 14:13-20.).

Plaintiff argues that there is "unanimity of opinion from every medical expert who gave testimony during the discovery phase of this action: namely, [she] sustained a severely comminuted fracture of the calcaneus and this injury required surgical treatment within two weeks." (Pl. Opp. at 15 (emphasis added).) This claim mischaracterizes the testimony and the record as a whole. No medical professional stated that Plaintiff required surgery in two weeks: not the Peconic doctor who initially examined her and prepared discharge instructions,[6] not the orthopedic specialist Dr. Brennan, not Plaintiff's surgeon and expert Dr. Kormylo,[7] and not Defendants' expert Dr. Weissberg. Clearly, this

---

[6] While Plaintiff makes much of the fact that the instruction to "follow up with orthopedics this week" was capitalized (Pl. Opp. at 2, 6, 11, 15, and 16), she ignores that many of the instructions were capitalized, including the directive that she, an inmate confined in a correctional facility, "no[t] driv[e] with Percocet." (Discharge Instructions at 5.) The Court thus does not find the capitalization argument persuasive.

[7] To the extent Dr. Kormylo testified that JMU employees' actions did not meet the standard of care "for humanity," the Court finds this hyperbolic statement to be tempered by his own admission that he had no familiarity with the level of care a

14

is not a case where officials deliberately delayed care as punishment, ignored a life threatening and fast-degenerating condition, or delayed major surgery for years. See Demata, 198 F. 3d at *2. Rather, it is a "difference[ ] of opinion between [Plaintiff] and the defendants concerning the proper course of treatment." Id.

Further, while Plaintiff surmises that "[s]urgery . . . does not come cheap so that one cannot avoid the reasonable inference that these Defendants were in no hurry to saddle their employer with a heavy expense when [her] release date was so near," (Pl. Opp. at 6), "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Pizarro, 2013 WL 990998 at *12 (prisoner's allegation that facility did not approve his surgery because the state could not afford it was insufficient to raise a triable issue of material fact). Plaintiff points to no specific record facts that could allow this Court to draw an inference in her favor that the Defendants postponed her referral to save money. Accordingly, Plaintiff has not established the objective or subjective components of deliberate indifference as to Buerkle.

---

correctional facility is legally required to provide. (Kormylo Dep. 59:7-24.)

B.  Dr. John

John saw Plaintiff once, ten days after her injury.  When Plaintiff complained that she was in pain and the ibuprofen prescribed by Buerkle was not working, he changed her medication and ordered a sonogram.  He noted in her chart that the request for a consultation was pending.  Again, at the time John saw Plaintiff, no other medical professional had stated that she required surgery.  For the same reasons discussed as to Buerkle, the Court concludes that John did not display deliberate indifference to Plaintiff's medical needs.

C.  Dr. Geraci

"Absent some personal involvement by [a] supervisory official in the allegedly unlawful conduct of his subordinates, he cannot be liable under section 1983."  Hernandez, 341 F.3d at 144–45.  Supervisor liability can be established in one or more of the following ways:

> (1)  actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

Id. at 145.  It is undisputed that Geraci, the chief of the JMU,

never examined Plaintiff. She argues, however, that he had personal involvement because he testified that "we knew the patient needed a referral and we made the referral." (Pl. Opp. at 11.) According to Plaintiff, Geraci's use of "the pronoun 'we' clearly . . . can be interpreted to include himself, thereby making himself a part of the group that failed to obtain an orthopedic consult" in time. (Pl. Opp. at 11.) She claims Geraci had "actual or constructive notice of unconstitutional practices and demonstrate[d] gross negligence or deliberate indifference in failing to act." (Pl. Opp. at 14 (quoting Meriwether v. Coughlin, 879 F. 2d 1037 (2d Cir. 1989).)

The Court does not find supervisor liability. First, the Court finds no underlying violation for the reasons set forth above. Second, even if the Court had found that Buerkle or John violated Plaintiff's constitutional rights, Plaintiff has offered no basis to conclude that Geraci (1) actually directly participated in a constitutional violation, (2) failed to remedy a wrong after being informed through a report or appeal, (3) created a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowed such a policy or custom to continue, (4) was grossly negligent in supervising subordinates who committed a violation, or (5) failed to act on information indicating that unconstitutional acts were occurring. Thus, Geraci's supervision

was not deliberately indifferent.  See Hernandez, 341 F. 3d at
145.

In sum, while Defendants did not bring Plaintiff to a
specialist within one week, over the course of the three weeks
before her release, they: examined her multiple times, listened to
and noted her complaints, iced her injury, prescribed medication,
changed her medication when she reported it was not working,
requested a consultation, followed up with the request and had her
sign a release, ordered a sonogram to rule out other injuries, and
sent her back to the hospital to receive additional care.  Notably,
when Plaintiff was released and had control over her own medical
care, she did not see Kormylo for two weeks--approximately the
same amount of delay she alleges amounted to deliberate
indifference from Defendants.  The Court thus finds that Defendants
are entitled to summary judgment.

III. Qualified Immunity

Plaintiff argues that if summary judgment in favor of
Defendants is denied as to deliberate indifference, then it would
be "entirely illogical to separately grant summary judgment on
qualified immunity grounds."  (Pl. Opp. at 22.)  This Court has
granted summary judgment in favor of Defendants, but will briefly
discuss qualified immunity arguments in the alternative.

"Qualified immunity will defeat a federal claim unless
a plaintiff pleads facts showing (1) that the official violated a

statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." Gonzalez v. Hasty, 755 F. App'x 67, 69 (2d Cir. 2018) (internal quotation marks and citation omitted). "The doctrine is broad in scope, and as the Supreme Court has repeated on several occasions, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." Jones v. Rivera, No. 16-CV-4495, 2017 WL 2389591, at *3 (E.D.N.Y. June 1, 2017).

Although Plaintiff conclusorily argues that Defendants were deliberately indifferent and thus qualified immunity should not attach, she points to no case demonstrating that a two-week delay in follow-up with an orthopedic referral rises to a constitutional violation. At most, she submits that "far less serious injuries/conditions (i.e. migraine headaches) have been found to meet the objective prong of serious medical needs." (Pl. Opp. at 16.) This is insufficient. "While qualified immunity does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." Gonzalez, 755 F. App'x at 69 (internal quotation marks and citation omitted). "In practice, this means that officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Jones, 2017 WL 2389591 at *3-4 (internal quotation marks and citations omitted) (explaining that "the dispositive question is whether the

violative nature of <u>particular</u> conduct is clearly established . .
. in light of the specific context of the case, not as a broad
general proposition.") (alterations in original; internal
quotation marks and citation omitted). The Court finds it is far
from "beyond debate" that Defendants actions here amounted to an
Eighth Amendment violation, as explained in more detail in the
previous discussion. As Plaintiff has not demonstrated that
Defendants violated a clearly established constitutional right,
they are entitled to qualified immunity.

IV. <u>State Law Claims</u>

As a result of the Court's conclusions as to Plaintiff's
constitutional claims, only Plaintiff's state law claims for
medical malpractice remain. "Although the dismissal of state law
claims is not required when the federal claims in an action are
dismissed, a federal court may decline to exercise supplemental
jurisdiction over the state law claims pursuant to 28 U.S.C.
§ 1367(c)(3)." <u>Manginelli v. Homeward Residential, Inc.</u>, No. 13-
CV-2334, 2013 WL 6493505 (E.D.N.Y. Dec. 9, 2013) (citations
omitted). The Court has weighed the relevant factors in exercising
its discretion in this regard--i.e., the values of judicial
economy, convenience, fairness, and comity--and in light of the
dismissal of Plaintiff's federal claims, the Court declines to
exercise supplemental jurisdiction over Plaintiff's state law
medical malpractice claims. As a result, the Court does not reach

the parties' arguments regarding a timely Notice of Claim under New York General Municipal Law § 50.

CONCLUSION

For the foregoing reasons, Defendants' summary judgment motion (D.E. 56) is GRANTED in its entirety. Plaintiff's constitutional claims are DISMISSED with prejudice and her state law medical malpractice claims are DISMISSED without prejudice to refiling in state court. The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:   August __8__, 2019
         Central Islip, New York